# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PAMELA VAN DEN ENG,

          Plaintiff,

    v.                              Case No. 03-C-504

THE COLEMAN COMPANY, INC.,

          Defendant.

## DECISION AND ORDER

      This case arises out of a tragic accident that occurred in a small hunting cabin in October 2000. The plaintiff asserts that defendant Coleman should be found negligent and/or strictly liable for the death caused by its product, a Powermate 5012 propane heater. Eight motions are currently pending. Coleman filed a motion for summary judgment as well as motions to strike the testimony of each of the plaintiff's experts and declarations filed by those experts. It also filed a motion seeking review of the plaintiff's responses for its requests for admissions. For its part, the plaintiff has filed a motion for sanctions based on Coleman's conduct in discovery. All of these pending motions are addressed herein.

### I. Background

      The facts involving Patrick Van Den Eng's death are largely undisputed. Van Den Eng and his friend Dean Drossart were found dead in Drossart's 8' x 12' hunting cabin by Michael Delfosse, a friend or acquaintance of Drossart's who was planning to accompany them hunting. Van Den Eng and Drossart had suffered carbon monoxide poisoning during their sleep and died as a result. To

keep warm, they had used a Coleman Powermate 5012 propane heater during the night while leaving only a few inches of the cabin's window cracked.

The heater belonged to Delfosse, who had loaned it to Drossart prior to the hunting trip. Delfosse had purchased the heater at the Rib Lake True Value on his way Drossart's cabin on November 24, 1997. The heater had the following warning affixed to it:

> "**Follow Instructions and Warnings to avoid fires, serious injury, or death**."
> ! Warning
> • For outdoor or well ventilated construction use only. Never use inside home, camper, tent, vehicle or other unventilated or enclosed areas. This heater consumes air (oxygen). Do not use in unventilated or enclosed areas to avoid endangering your life.
> . . . .
> • Never modify or alter heater in any way.

(DPFOF ¶ 10.)[1]  Upon reading the warnings after Delfosse purchased the heater, Delfosse and Drossart had briefly discussed whether they should use the heater inside Drossart's hunting cabin and decided to do so with two windows open about two inches. They operated the heater in the "low" position and awoke the following morning with no ill effects. Delfosse also used the heater without difficulty inside a workroom in his garage. Ventilation was provided through the garage's flow-through soffit system and by leaving the two garage windows and the overhead garage door open about two inches.

The heater was designed so that its knob would automatically spring to the "off" position if the user attempted to set it anywhere below "low." When Van Den Eng and Drossart used the heater on the night of their deaths, however, Drossart placed a stick into the control knob so that the knob was stuck somewhere between "low" and "off." Thus, the stick prevented the knob from

---

[1]In addition to the warnings on the heater itself, there is evidence that several other people warned Drossart not to heat his cabin with the heater.

springing automatically to the "off" position, which allowed the heater to be operated at a level lower than Coleman's intended minimum "low" output of 8,000 b.t.u. Drossart had previously told Delfosse that operating the heater in this fashion would prevent it from getting too hot. Unfortunately, when operated with such low output the heater produced lethal levels of carbon monoxide.

The facts relating to Coleman's development and marketing of its propane heaters are less clear and more in dispute. The evidence viewed in the light most favorable to the plaintiff, however, as it must be for purposes of deciding Coleman's motion for summary judgment, supports the following findings. Coleman, known nationally for its camping equipment, began manufacturing propane radiant heaters in 1984. Coleman initially manufactured such heaters under the "Focus" name and marketed the heaters for camping use. In 1996, however, sometime after the Consumer Products Safety Commission (CPSC) had conducted an investigation of a series of carbon monoxide deaths involving propane heaters from Coleman's "Focus" line and begun a review of safety standards for carbon monoxide emissions for camping heaters, Coleman discontinued the Focus line of propane heaters.[2] Beginning in 1995, Coleman began marketing

---

[2]Coleman argues that none of the facts recounted in any of the CPSC documents plaintiff received from Coleman's document production, can be considered as evidence because the documents constitute hearsay and lack foundation. (Coleman's Reply, at 3, n. 3.) However, Rule 803(8) of the Federal Rules of Evidence excludes from the hearsay rule "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... or (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8); *see Roth v. Black & Decker, U.S., Inc.*, 737 F.2d 779, 783 (8th Cir. 1984) (rejecting claim that district court erred in admitting into evidence excerpts from reports prepared by or for the United States Consumer Products Safety Commission); *but see also Smith v. Isuzu Motors Ltd.*, 137 F.3d 859, 862 (5th Cir. 1998) (holding district court properly excluded memoranda prepared

3

portable propane radiant heaters under the "Powermate" label "for outdoor or well ventilated construction use only." Despite its warning that the Powermate heaters were for construction use only, it appears campers also purchased them for use in tents, campers and similar camping uses. According to Coleman's records, sixty people died from carbon monoxide poisoning while using Coleman propane radiant heaters between 1990 and 2004, twenty-two while using one of its "Powermate" models. (Docket # 69, Ex. 3.)

Although Coleman contends the two brands of heaters are very different, plaintiff contends that they are substantially similar. Both brands were intended to be used in conjunction with propane cylinders as fuel sources. All but one of the "Focus" models and all of the Powermate models allowed the user to vary the heat outputs by selecting a lower b.t.u. setting. The output could be reduced further from the lowest setting by adjusting the fuel flow at the propane tank or by manually holding down the control valve. When operated on reduced fuel flow, the heaters produced increased, and potentially lethal, levels of carbon monoxide. Other than the b.t.u. per hour output, which ranges from a maximum of 3,000 b.t.u. in the smallest Focus 5 to 45,000 b.t.u. in the largest Powermate model, the size of the propane cannister to which they attach, and the size and shape of screens, the evidence suggests that the Powermate and Focus brands propane heaters are essentially the same. Each produces radiant heat in the same manner, involving the mixing of

---

by staff members of the National Highway Traffic Safety Administration). In addition, to the extent they are offered to show merely Coleman's knowledge, they would not constitute hearsay. *See* Fed. R. Evid. 801(c). Finally, the facts that the CPSC documents are on CPSC letterhead and came from Coleman's document production along with letters by Coleman employees explicitly referencing them constitute sufficient evidence of their authenticity, at least for present purposes. *See* Fed. R. Evid. 901(a).

propane and air which are forced into a double-screened area where combustion occurs and heat is generated.

## II. Motion for Summary Judgment

Summary judgment is proper only when there are no genuine issues of material fact and when the evidence demonstrates that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. As the plaintiff notes, summary judgment is seldom granted in a case like this: "summary judgment is rarely appropriate in negligence cases due to the multitude of factual issues which need to be resolved by the jury." *Jakubiec v. Cities Service Co.,* 844 F.2d 470, 473 (7th Cir. 1988). In Wisconsin,

> Summary judgment is uncommon in negligence actions, "because the court 'must be able to say that no properly instructed, reasonable jury could find, based on the facts presented, that [the defendants] failed to exercise ordinary care.' " The concept of negligence is peculiarly elusive, and requires the trier of fact to pass upon the reasonableness of the conduct in light of all the circumstances, " 'even where historical facts are concededly undisputed.' " Ordinarily, this is not a decision for the court.

*Alvarado v. Sersch,* 2003 WI 55, 662 N.W.2d 350, 356-57 (Wis. 2003)(citations omitted). Thus, although I recognize the possibility that summary judgment could be feasible in a case like this, the granting of such a motion would mean that a jury could produce only one reasonable verdict, which is a rare occurrence. With that caveat in mind, I will proceed to address the defendant's arguments in favor of summary judgment.[3]

_____

[3]Normally the well-worn summary judgment standards are not subject to comment or elucidation, but in this case a word is required. The briefing on the summary judgment motions is quite extensive (as it is with the other motions) and obviously represents the substantial and good faith efforts of both parties' counsels. Yet, having reviewed the parties' filings, I am not persuaded that the legal issues raised therein are particularly complex, or at least deserving of the extensive treatment and motion practice they have received. The case is brought under theories of negligence and strict liability–both commonly encountered in federal court–and the facts alleged, while tragic,

5

**1. Negligence**

A common law negligence claim requires proof of four elements: duty, breach, causation and damages. *Thomas ex rel. Gramling v. Mallett,* 2005 WI 129, ¶ 101, 701 N.W.2d 523 (Wis. 2005). The plaintiff claims the 5012 heater was negligently designed because it lacked adequate warnings and failed to have features that would shut it off if conditions became dangerous. In the plaintiff's view, either the presence of safety features or stronger, more specific, warnings could have prevented the plaintiff's death.

At present, the parties focus exclusively on the issue of causation. Coleman asserts that the plaintiff cannot recover because Drossart placed a stick in the heater's control knob, overriding one of the heater's safety features. Thus Drossart, not Coleman, was the cause of death. It also claims that there is no evidence any of the plaintiff's proposed safety features would have prevented the deaths in this case. Moreover, it notes that the heater did have warnings that it should not be used indoors or in enclosed spaces; it also warned that the heater should not be altered in any way. Because Drossart and Van Den Eng ignored *those* warnings, Coleman asserts, the plaintiff has no basis to say that any other warnings would have prevented their deaths.

**a. Design Defect**

A product can be negligently designed if it creates an unreasonable risk of harm to the consumer. *Sharp ex rel. Gordon v. Case Corp.,* 595 N.W.2d 380, 388 (Wis. 1999). "All that it is necessary to prove is that the product is designed with a lack of ordinary care and that lack of care

_____

do not seem to require the exceptional amount of explication that has been attempted. That said, my concern is not limited to economy and conservation of efforts–although that is a prominent concern–but extends to the nature of summary judgment itself. The present filings, given their detail and extensive factual groundwork, suggest that the parties are attempting (deliberately or not) to put on a sort of paper trial.

resulted in injury." *Id.* at 387 (quoting *Greiten v. LaDow,* 235 N.W.2d 677, 685-86 (Wis. 1975)(Heffernan, J., concurring)).

The plaintiff claims the heater was dangerous because it failed to have an oxygen depletion sensor (ODS) and it lacked a timer or other features, such as a different control valve, that would have prevented the deaths in this case. The ODS has received the particular attention of the parties. An ODS would shut down the heater if oxygen levels in the space fell below roughly 18%, which the plaintiff asserts could have prevented the deaths in this case. One of the plaintiff's experts, Robert Engberg, attempted to put an ODS into use by conducting an experiment in an enclosed cardboard box. Apparently the experiment was not a complete success, however, because Engberg was unable to obtain low enough oxygen levels in the cardboard box. Coleman believes this shows that the facts of the case contradict the plaintiff's theory and show instead than an ODS would not have prevented the accident here. As such, the absence of an ODS cannot be deemed a cause of the plaintiff's death.

The plaintiff acknowledges that the cardboard box test was not conclusive, but it notes that it is not the only evidence that an ODS would have prevented the deaths. In particular, it offers the testimony of Alan Bullerdiek, a chemical engineer. Bullerdiek visited the site and estimated that with two men breathing in that space, the oxygen levels would have dropped below the threshold that would trigger the ODS (shutting off the heater) *before* the carbon monoxide reached a fatal level. The plaintiff also notes that Engberg has other experience with ODS systems and Coleman heaters.

7

Coleman does not argue that an ODS would be economically unfeasible.[4] Instead of addressing the economic feasibility (or logic) of installing an ODS system on a heater that it claims is intended to be used outdoors, it limits its defense to an argument that the plaintiff's experts have not shown the *technical* feasibility of such a device. But such an argument, under these facts, is best left for a jury to decide. The plaintiff's expert, Robert Engberg, was not attempting to show conclusively that such a system would always work, merely that an ODS would be a feasible way of ensuring that the heater would shut down when oxygen supplies became depleted. That much is already known. As an Oregon court noted in *Benjamin v. Wal-Mart Stores, Inc.,*

> We agree with plaintiff. At trial, she offered the testimony of Robert Engberg, a mechanical engineer with experience in designing gas systems and in investigating accidents involving liquefied petroleum gases, including propane. Engberg testified in part regarding oxygen depletion sensors; he testified that they consist of a "pilot light and thermocouple assembly," described their operation, testified that they "are very widely used in Europe and are becoming common and more used in the United States," and testified that they have been commercially available since at least 1982. He also testified that he believed that it was feasible to have incorporated an ODS on a Coleman Focus 15 heater and that, when he modified a Focus 15 heater by incorporating an ODS, the heater shut down before it produced a dangerous level of

---

[4]Under Wisconsin law, such an argument could be raised in an attempt to show that the proposed safety feature would make the product "unduly expensive," *Sumnicht v.Toyota Motor Sales, U.S.A., Inc.,* 360 N.W.2d 2, 17 (Wis. 1984) (quoting *Collins v. Ridge Tool Company,* 520 F.2d 591, 594 (7th Cir. 1975)), in which case the failure to include the safety feature is not a basis for defective design. Given Coleman's argument that the heater was intended for *outdoor* applications only, it could be argued that it should not be required to have safety features only useful on indoor heaters. "It is boilerplate law that, merely because a product or an operation is not as safe as possible, because there are better methods of manufacture or performing an operation does not lead to the conclusion that the method employed was undertaken with a lack of ordinary care or the product was defective." *Greiten,* 235 N.W. 2d at 687. Thus, every automobile need not have all the safety features of a Volvo, and not every sedan must have the off-road capabilities of a Jeep. Consumers are entitled to choose models with fewer safety features, just as they are entitled to purchase products with only limited (e.g., outdoor use only) applications. Indeed, as one of the plaintiff's experts noted, adding an ODS to every Coleman 5012 heater would add $20 to $25 to the cost of each unit, which is a significant portion of the price of a small heating unit like the 5012. (DPFOF ¶ 112.)

8

carbon monoxide. Engberg opined that incorporation of an ODS into the Focus 15 heater was a reasonable alternative design that would have made the heater safer and that the additional production cost of a Focus 15 heater that included an ODS would be $18.65.

We conclude that Engberg's testimony constitutes evidence from which the jury could have found that, at the time the Focus 15 heater left Coleman's hands, it was in a condition not contemplated by the ultimate consumer and was unreasonably dangerous to that consumer, that is, was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Specifically, the jury could have found from Engberg's testimony that incorporating an ODS device would have constituted a safer design and that that design was practicable and feasible.

61 P.3d 257, 268-69 (Or. Ct. App. 2002).

In this case, although Engberg was unable to duplicate the test on the 5012 heater, the plaintiff has gone to some effort to show that the 5012 is very similar to the Focus 15. Apart from repeatedly pointing out that Engberg has not produced a result on the 5012, Coleman has not explained how his other tests on Coleman heaters would not be relevant or provide a basis for his opinions. It can certainly cross-examine Engberg on the point and on his failure to obtain a result in this case; but that single failure does not, in itself, mean that an ODS system would not have prevented Van Den Eng's death.[5]

**b. Warnings**

The plaintiff also asserts that the Powermate 5012 heater had inadequate warnings and was rendered dangerous thereby. As noted above, a warning affixed to the heater stated that it was "for outdoor or well ventilated construction use only." It noted the heater "consumes air (oxygen)" and

---

[5]The plaintiff has other theories of how the heater should have been more safely designed, but they are not so much the subject of the summary judgment motion as they are the defendant's motions to exclude expert testimony.

9

stated it should not be used "in unventilated or enclosed areas to avoid endangering your life." Despite this warning, however, the heater was used in a very enclosed space with only a cracked window letting in fresh air. Moreover, Drossart also apparently ignored the warning to "never modify or alter the heater in any way" when he manipulated the control knob. Because Drossart and Van Den Eng ignored all of these warnings, Coleman asserts, any failings in the warnings Coleman *did* provide cannot be said to be the cause of Van Den Eng's death.

But it is not obvious that Drossart and Van Den Eng simply ignored Coleman's warnings. At the outset, it should be noted that there is no evidence Van Den Eng ever saw the warning. He was, after all, a guest in Drossart's cabin and may have simply relied on Drossart's knowledge and experience in heating his own cabin. Even aside from this fact, however, the warnings are less than clear regarding the crucial question of whether such a heater can ever be safely used in such a setting. The statement "Never use inside home, camper, tent, vehicle *or other unventilated or enclosed area*" suggests that it can be used in such areas that are ventilated or not fully enclosed. Further adding to the possible confusion is the fact that the box in which the heater was packaged depicted the heater being used inside a garage and attic.[6]  For these reasons, Drossart may have thought that by leaving a window slightly open he was providing ventilation and, thus, following the instructions, not ignoring them. This interpretation would be consistent with the common sense understanding of a typical consumer that a heater is intended to heat a place in which people seek shelter, not the entire outdoors. Given the magnitude of the risk, i.e., death, a jury could conclude

---

[6]Coleman argues this fact is irrelevant since there is no evidence Van Den Eng ever saw the box. But the evidence does suggest that Delfosse, who purchased the heater, and Drossart, who operated it on the fateful night, did see the box and thus may have been influenced by the depictions thereon.

10

that a clearer warning should have been given. For this reason, I agree with the plaintiff that at this stage it cannot be said as a matter of law that Coleman's failure to provide more specific warnings was not a substantial factor in Van Den Eng's death.

It is also significant that conspicuously absent from the warnings Coleman provided was any mention of the dangers of carbon monoxide, which was the actual cause of the plaintiff's death.[7] Plaintiff has produced evidence that to be effective a warning may require more specificity than merely something like "do not use indoors." (Docket # 69, Ex. 4, at Col-9837 - Col-989840.) By way of illustration of this point, suppose next to a rocky cliff a large sign warned hikers to stay away from the edge in order "to avoid danger and death." An expert hiker read the sign but decided to take his chances, only to fall and sink into a hidden pool of quicksand next to the cliff's edge. The hiker ignored the danger sign, it is true, but he likely did so on the incorrect assumption that the only danger present was the risk of falling off the cliff, perhaps due to loose rocks or treacherous precipices. Quicksand was not a consideration. Thus, although he ignored a warning the observance of which would have saved his life, we have no idea what the hiker would have done had the warning sign specified the *particular* risk he was assuming. It is not difficult to conclude that "Danger: Quicksand!" would yield different results than the more general "Danger: Stay Away From Edge!" *See, e.g., Falkner v. Para Chem*, 2003 WL 21396693, *9 (Ohio Ct. App.

---

[7]In 1992, Coleman, in consultation with the CPSC, agreed to revise its warnings for the Focus 5 heaters to add a specific reference to carbon monoxide poisoning and even immediately develop a "hang tag" warning of the danger that would be attached to small propane cylinders it produced. (Docket # 69, Ex. 4 at Col-8313.) However, Coleman elected not to include a warning about carbon monoxide poisoning on any of its Powermate heaters until it added a brochure explaining the dangers of carbon monoxide to new Powermate 5012 models after May 1997. Even then, Coleman did not add the brochures to heaters already in the chain of distribution or attempt to distribute them to individuals who had already purchased the heaters. (Pl.'s PFOF ¶¶ 28, 98)

11

2003)(noting that "Do Not Use Indoors" is not always sufficient warning when specific danger is not stated; the injured party "testified that he understood the warnings on the label to mean that the M280 would ignite if exposed to an open flame. . . . [he did not appreciate] the risk that vapors from the M280 might travel to distant ignition sources and ignite and/or explode.")

Applying this example to the present case, Drossart could have assumed that indoor use of a heater posed risks of fire (which is obvious) or oxygen depletion (which is specifically stated) and elected to take other precautions against those risks. There is some evidence to suggest this was the case. Drossart apparently told Delfosse that he used the stick to get the heater to burn at a lower setting so that it would not get so hot. Perhaps he also placed it such that it was as far away from any combustibles as possible. He apparently opened a window to provide some ventilation. But since carbon monoxide was not mentioned as a danger, that risk may not have been a part of his calculus. As with the hiker in the example, it is far from clear that a different, more specific, warning would have convinced them that indoor use of the heater (in the manner they attempted) was exceptionally dangerous. Based on the evidence before me, I cannot say that it would be unreasonable for a jury to conclude that, with a more specific warning, they would have acted differently.

Indeed, in the Oregon case cited above, the court concluded that a jury could have found the warnings to be inadequate. Although the heater warned that it was for "outdoor use only," the court found "there was evidence from which the jury could find that, although the warning told the user not to operate the heater in a tent or any other unventilated or enclosed area, it did not convey the 'consequences'--that is, 'the nature and extent of the danger'--of doing so," i.e., carbon monoxide poisoning. *Benjamin,* 61 P.3d at 266. Moreover, the court also rejected Coleman's argument that

Case 1:03-cv-00504-WCG   Filed 06/09/06   Page 12 of 32   Document 266

the deceased's failure to heed the warnings meant that a better warning would not have prevented his death. In fact, the deceased had borrowed the heater from a friend who told him "don't die in my tent" when he loaned him the heater. Although, as in this case, Coleman claimed that the deceased's behavior showed a propensity to ignore safety warnings, the court concluded that the jury had enough evidence to find that the failure to warn about carbon monoxide was a cause of the death. *Id.* at 267-68. In sum, based on the facts in the record, I cannot conclude as a matter of law that the lack of adequate warnings was not a cause the plaintiff's death. *See also Goehring v. Target,* 91 Fed.Appx. 1, *6 (9th Cir. 2004) (finding causation to be a jury question when consumer ignored warnings on propane heater).

**c. Public Policy**

Finally, Coleman claims that even if causation could be established, Wisconsin's public policy should serve as a bar to liability for negligence in this case. In Wisconsin, when "public policy" is used in the context of precluding tort liability, the term is similar to "proximate cause." *Fandrey ex rel. Connell v. American Family Mut. Ins. Co.,* 2004 WI 62, 680 N.W.2d 345, 351 (Wis. 2004).

As the plaintiff notes, generally it is proper to determine whether negligence exists before answering the public policy question. "In most cases, the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability. Only in those cases where the facts are simple to ascertain and the public policy questions have been fully presented may a court review public policy and preclude liability before trial." *Alvarado v. Sersch,* 2003 WI 55, 662 N.W.2d 350, 355 (Wis. 2003). The principal reason not to put the cart before the horse is that the jury's determination of liability can itself be a factor in the judge's public policy

13

analysis, particularly when foreseeability is an issue: "[b]esides having the aid of the jury's opinion when assessing liability, a judge will also be aided by the facts that were brought to light during the jury trial." *Id.* That general rule also holds true for this case. Without causation being established, it would be difficult to conclude either way whether public policy considerations should come into play. I thus conclude that this is "not one of those simple cases where public policy can be used to limit liability before finding negligence," *id.*, and accordingly I will not dismiss the plaintiff's negligence claims at this stage of the proceedings.

## 2. Strict Liability

The defendant also moves for summary judgment on the plaintiff's strict liability claim. "The rule of strict liability, as adopted in Wisconsin, requires proof that the product was in a defective condition, unreasonably dangerous, which caused the plaintiff's harm." *Sumnicht,* 360 N.W.2d at 11. Whereas negligence implicates a manufacturer's conduct and ascribes fault, strict liability is a type of negligence per se. "It is not necessary to show any specific acts of negligence. It is not necessary to show duty in terms of foreseeability. It is enough to prove, irrespective of due care, that, because of its dangerously defective nature, the product caused harm." *Greiten,* 235 N.W.2d at 685 (Heffernan, J., concurring).

A strict liability claim has five elements:

(1) that the product was in defective condition when it left the possession or control of the seller,
(2) that it was unreasonably dangerous to the user or consumer,
(3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,
(4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and,

14

(5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

*Morden v. Continental AG,* 611 N.W.2d 659, 673 (Wis. 2000) (quoting *Dippel v. Sciano,* 155

N.W.2d 55, 63 (1967)).

Coleman focuses on the last of these elements and argues that the product did not reach the

consumer "without substantial change" because Drossart rigged the heater's knob with a stick. The

defendant relies on *Glassey v. Cont'l Ins. Co.,* 500 N.W.2d 295 (Wis. 1993), a case in which the

plaintiff was injured when a cap blew off a pressurized spray tank and struck him in the head. The

cap in question was a nonstandard cap that had been replaced on the machine since its manufacture.

The court noted several differences between the replacement cap and the original:

> The most important and material change is that the original DeVilbiss filler cap was replaced with a "plumbers cap." A plumbers cap is normally used to seal off abandoned gas pipes. There are a number of substantial differences between the original DeVilbiss cap and the replacement cap. The original DeVilbiss cap and filler neck had straight threads designed for repetitive opening and closing. The DeVilbiss cap could be turned onto the filler neck by hand about 4 to 5 revolutions. The replacement cap had tapered threads, meaning the cap narrowed towards its top. The replacement cap could only be turned 1 to 1 1/2 turns onto the filler neck. The original DeVilbiss cap had a rubber gasket underneath the top of the cap. The gasket allowed the DeVilbiss cap to seal with the neck by the top edge of the filler neck pressing against the gasket when the cap was fully screwed onto the filler neck. The original DeVilbiss cap also contained four vent holes. When the cap is unscrewed, while there is pressure in the spray tank, air will pass through these vent holes alerting the user to the presence of pressure in the tank. The replacement cap contained a home-made gasket which did not seal with the filler neck because the cap could not be screwed on far enough. The replacement cap was designed to make a thread-to-thread seal with its tapered threads. The replacement cap did not have vent holes. The threads on the replacement cap and filler neck were badly corroded and worn at the time of the accident.

*Id.* at 299. Because of all of these differences, and because the cap was essentially the cause of the

accident itself, the court concluded that the tank's manufacturer could not be held strictly liable: "In

15

this case there was a substantial and material change in the design and character of the spray tank linked to the accident because the DeVilbiss filler cap was replaced with a non-standard cap. This change was material to the accident because it was the replacement cap that blew off the spray tank striking Glassey in the head." *Id.* at 301.

The plaintiff counters that the stick Drossart used was not so much an alteration of the product as it was a foreseeable misuse of the product. In *Schuh v. Fox River Tractor Co.,* 218 N.W.2d 279 (Wis. 1974), the plaintiff was injured while standing on a piece of farm equipment. The manufacturer had placed a warning telling users not to stand on the machine, but the question was whether such a use was foreseeable or not:

> it is a general proposition that a plaintiff, to recover in strict liability in tort, must establish that the product proved defective, and the injury occurred when it was used in a foreseeable manner. In other words, foreseeable use is a requirement for a case in strict liability in tort, just as it is in negligence or warranty cases. If the plaintiff can be shown to have used the product in a manner other than its intended use, and particularly if that abnormal use related to the occurrence of the injury, liability should not follow unless the abnormal use was itself foreseeable.

*Id.* at 286 (citing *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79, 83-84 (4th Cir.1962)).

I conclude that this case is more like *Schuh* than *Glassey*. First, it is not as though Drossart installed a nonstandard knob on the heater or changed the physical structure of the heater; instead, he used a simple stick to prevent the heater from turning off as he tried to reduce its output. In other words, he altered the heater's functioning without altering the heater itself. Although the turn-off feature was apparently intended as a safety device, there is no evidence that Drossart was aware of that fact. Coleman has pointed to nothing in the instructions or warnings that would have informed him that operating the heater at a reduced output could be lethal.

16

Moreover, the desire to adjust the heat thrown off by a heater either upwards or downwards, depending on the circumstances, is not unusual. In fact it is consistent with the experience of most people. We are used to adjusting the heaters in our homes, offices and automobiles. This common experience, a jury could reasonably conclude, should have made the risk that a camper would attempt to override the automatic shut-off feature foreseeable to the manufacturer.

Most important, however, is that the manipulation of the control knob is inextricably linked to the issue of inadequate warnings because the lack of adequate warnings could have made alteration of the heater foreseeable. For instance, it would be one thing if Drossart had somehow rigged the heater to an artificially *higher* setting and then died when the hunting shack caught fire due to an explosion or flameout. Whether his alteration in that instance would fall under assumption of risk, contributory negligence or product alteration, it is clear that such an act could relieve the manufacturer of liability. It would also be a different case if the heater had warned: "Altering control knob can cause death from carbon monoxide." In contrast, in this case the risk of carbon monoxide poisoning was unknown–due to the absence of warnings about it–and in particular it was unknown (and even counterintuitive) that the risk of poisoning *increased* as the heater's output *decreased*. A jury could reasonably conclude that Drossart thought he was making the product *safer* when he artificially set it on the lowest possible setting. Indeed, this underscores why particularity in warning labels is important, because the warnings govern the scope of what is foreseeable. In the absence of a more specific warning and for all of the foregoing reasons, I am unable to conclude that the product was altered in such a way that the manufacturer cannot be strictly liable.

17

### 3. Punitive Damages

The defendant also moves for summary judgment on the plaintiff's claims for punitive damages. It asserts that punitive damages are not available in Wisconsin for wrongful death claims and that, because there is no evidence that Van Den Eng suffered before he died, punitive damages are not available for the plaintiff's survival claim either. As to the survival claim, the plaintiff argues that the defendant's expert, Dr. Stewart, testified that it is possible for carbon monoxide victims to experience pain while being unable to move due to the poisoning. That is true enough, but there is no evidence that Van Den Eng actually suffered at all. Given that Van Den Eng was found tucked inside his sleeping bag and given Stewart's conclusion that he died while unconscious with high carboxyhemoglobin levels, a reasonable jury would have no basis other than pure speculation to conclude that Van Den Eng suffered.

As to the wrongful death claim, the defendant argues the Wisconsin Supreme Court's decision in *Wangen v. Ford Motor Co.,* 294 N.W.2d 437, 464 (Wis. 1980) precludes punitive damages. The *Wangen* court concluded that because wrongful death claims were created by statute and because the statute limited the kinds of damages available to "pecuniary injury, . . . loss of society and companionship and for medical and funeral expenses," punitive damages were not recoverable. *Id;* Wis. Stat. § 895.04(4)-(5)*.* The plaintiff claims Wisconsin statutes now allow punitive damages for wrongful death claims, however. In 1995 the state legislature enacted Wis. Stat. § 895.85, which governs punitive damages, and subsection (2) of that statute expressly excludes its application to certain enumerated other statutes. Absent from that list of exclusions is § 895.04, the wrongful death statute. Thus, in the plaintiff's view, because the statute governing

18

punitive damages excludes some applications but does not specifically exclude application to wrongful death claims, punitive damages must now be allowable for such claims.

Although the state law of punitive damages may have changed, there is no indication that the legislature wanted to change the law of wrongful death, as set forth in Wis. Stat. § 895.04. That statute reads largely as it did in 1980 when the Wisconsin Supreme Court decided *Wangen*, and the same considerations particular to wrongful death claims still apply. The statute still allows recovery for pecuniary and other damages without mention of punitive damages. Had the legislature intended to change the law, it would have been a simple matter to add punitive damages to the list of those damages available in a wrongful death action. Since it did not add punitive damages, and in light of the clear holding of *Wangen*, I find no basis to conclude that the legislature intended in 1995 to change the nature of damages allowable under the wrongful death statute. Therefore, I agree with the defendant that the plaintiff's claims for punitive damages will not go to a jury.

### III. Motions to Exclude Expert Testimony

Coleman has filed separate motions to strike the testimony and opinions of Alan Bullerdiek, Gary Hutter and Robert Engberg, as well as a motion to strike the declarations of Hutter, Engberg and Bullerdiek. It also filed a motion to exclude the opinions of Marvin Salzenstein, an expert retained by Drossart in his case against Coleman.

Generally, the plaintiff protests what might be described as Coleman's "divide and conquer" approach to excluding these experts. For example, with respect to each expert, Coleman asserts that the individual did not perform adequate testing to back up his opinions. The plaintiff, however, states that its experts are a sort of package deal and that each is entitled to rely on the observations and experience of the others in forming his opinion. Thus, even if one expert did not perform tests

19

sufficient to found his opinion, the information gleaned from the others, and from other sources, is fair game. For the reasons set forth below, I generally agree with the plaintiff and will not exclude any of the experts' opinions completely.

**1. Alan Bullerdiek**

The plaintiff retained Alan Bullerdiek, an engineer, largely to demonstrate design defects on the Coleman 5012 heater. His principal claim seems to be that the heater should have met ANSI combustion performance standard Z21.63, and Coleman does not address this contention except to state that it never certified the heater as meeting that standard. Instead, the bulk of Coleman's argument is that Bullerdiek failed to test his alternative design theories on any 5012 machine and could not identify other similar machines that had the safety features he suggested. Although these arguments sometimes constitute proper grounds for rejection under *Daubert*, in this case they are more properly the subject of cross-examination. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). There is of course nothing to prevent Coleman from undercutting Bullerdiek's opinions at trial and explaining to the jury how his opinion should be narrowly limited, but that is a far cry from saying that the jury should not even *hear* his opinion.

The Seventh Circuit's decision in *Chapman* is often cited for the principle that expert testing of a hypothesis is crucial, but that case involved an electrical expert's wholly novel theory, which the court described as follows:

> Petry [the expert] concluded that the insulation enclosing the pinched wire eventually became compromised, allowing a fatal amount of electrical current to "leak through" the insulation of a 120 volt wire without tripping a 20-amp circuit breaker. He further hypothesized that this leakage occurred for weeks prior to the accident, without completely destroying the insulation or causing a direct short.

20

Consequently, according to Petry, the grounding of the receptacle would not have prevented the electrocution. In response, Maytag argued that Petry was not qualified to offer such an opinion about electricity because: he does not have sufficient knowledge or experience in the field, he has no graduate training in electrical engineering, he does not attend education classes or seminars regarding electrical engineering, he has never published or lectured in the field of electrical science or engineering, and he has never previously testified as an expert on electrical issues. Maytag further argues that Petry never offered any study or writing to back up his theory and more specifically, he could not substantiate his opinion that it is even possible for a fatal amount of electrical current to "leak through" the insulation to an uninsulated surface without tripping the circuit breaker. Maytag asserts that Petry could not even show that the scientific community recognizes the concept of a "resistive short" or the principles on which this purported phenomenon is based.

*Id.* at 687.

The Seventh Circuit concluded that "[i]n our opinion, the absence of any testing indicates that Petry's proffered opinions cannot fairly be characterized as scientific knowledge. Personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert's* most significant guidepost." *Id.* at 688. In that case, however, it is clear that the court was skeptical of the expert's untested theory, which it described as "novel and unsupported by any article, text, study, scientific literature or scientific data produced by others in his field." *Id.* In contrast, the present case involves the application of existing technology to an existing product–*not*, as in *Chapman,* an untested assertion about the very principles of electricity.

The defendant also cites *Bourelle v. Crown Equipment Corp.,* 220 F.3d 532 (7th Cir. 2000), a case in which the district court struck the opinion of an expert who opined about additional safety features he claimed a fork lift should have had. Although that case is more persuasive than *Chapman* on the usefulness of testing (as applied to these facts)*,* it merely holds that it was not an abuse of discretion for the district judge to exclude the testimony in that case. That is far different from stating that exclusion is *required.* That said, the bulk of Bullerdiek's testimony is not the sort

21

of opinion that requires testing. To the extent he would be testifying about the feasibility of adding an ODS or other features to the 5012 heater, his testimony apparently would be based on a multitude of other information, including from the Consumer Products Safety Commission, for which he has previously worked. Coleman can certainly cross-examine him and question his conclusions in light of the fact that he has not personally created a prototype involving an ODS, but his failure to do so is not so damning that his testimony should be barred.

To the extent Bullerdiek would testify about his proposal that the heater should have used two valves (rather than one) so as to limit CO emissions, that too suffers from his lack of testing. Yet he was able to identify other products that use two valves and he can opine that such a system would have worked on the 5012. Once again, Coleman can certainly attempt to undercut his opinion by showing that he did not physically test the idea himself, but his opinion is not the sort of "junk science" or pure speculation that *Daubert* is meant to curtail. *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir. 2000) ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.")

Finally, to the extent Bullerdiek would testify about inadequate warnings, it appears his testimony on that score will be quite limited. Apparently Dr. Gary Hutter will be the primary warnings expert, and Bullerdiek and Robert Engberg would provide additional testimony about the "hierarchical" approach to design, which is an industry way of saying that product dangers should be avoided, guarded against and/or warned about, in that order. To this extent, it appears Bullerdiek is qualified to opine on design practices that include consideration of warnings, although he does not provide any basis for being the sort of "human factors" expert who could testify about the

22

effectiveness of various warnings on actual consumers. Thus, to the limited extent it appears Bullerdiek would testify about warnings, his testimony will be allowed.

## 2. Robert Engberg

Coleman believes that Robert Engberg should be disqualified because "Engberg's sole experience with the design of propane radiant heaters is in the context of litigation against Coleman." (Reply Br., Docket No. 243 at 2.) But that is unsurprising. Most experts retained for litigation purposes are generalists in their field who lack particularized knowledge of a product prior to being retained. *See, e.g., DePaepe v. General Motors Corp.*, 141 F.3d 715, 719 (7th Cir. 1998) ("GM complains that Syson had not tested or analyzed sun visor designs before this litigation, but a judge does not automatically abuse his discretion in concluding that an expert can offer useful information without having dealt previously with the product at issue in the case.")

The largest thrust of the defendant's motion to exclude is that there have been no successful ODS tests on the Powermate 5012 heater, the model at issue in this case. That is true. But Engberg has performed tests on other Coleman heaters, including the Focus line that the plaintiff alleges is substantially similar to the Powermate line. Coleman has not explained why the tests on its other heaters would be irrelevant to Engberg's conclusions. Indeed, it appears simply that Coleman's objection goes more to the *conclusion* Engberg reached rather than his methodology. Once again, clearly the failure to produce a definitive result on the 5012 could be grounds for questioning Engberg's opinions and conclusions, but it does not *ipso facto* provide a sound basis to exclude his opinions outright. Engberg is a mechanical engineer who has performed relevant tests on several Coleman heaters, and his opinion will assist the jury in determining whether the 5012 was unreasonably dangerous or defective.

23

As to his testimony on warnings, Coleman asserts that Engberg has admitted in other litigation that he is not a warnings expert. It also notes that the plaintiff has two other experts to testify about warnings, so Engberg's testimony (if allowed) would be cumulative. The plaintiff's response does not elaborate on what qualifications Engberg possesses to testify about warnings, nor does it detail exactly what he would be testifying about, except to say that his warnings testimony would be "limited," apparently in the same way Bullerdiek's will be. Because it is unclear what aid his warnings testimony would provide the jury, and because Engberg does not seem to possess warnings expertise, his warnings testimony will be excluded.[8]

### 3. Dr. Gary Hutter

Coleman levels a similar attack on Dr. Gary Hutter, who has a Ph.D. in environmental and occupational studies. First, it argues his failure to test the ODS design theory is fatal to his testimony about the purported design defect in the 5012 heater. The plaintiff counters that Hutter was entitled to rely on the testing performed by Engberg and other sources when he gives his opinions about design issues.

The plaintiff admits that Hutter is primarily a warnings expert (at least as employed here) and has not offered much explanation for the relevance of Hutter's testimony about the design of the heater. The plaintiff states that Hutter is entitled to rely on Engberg's testing, but does not explain what, if anything, Hutter would add to assist the jury in understanding the value or feasibility of an ODS. Indeed, the proposed testimony seems to simply rehash what other experts

---

[8]At this stage, of course, such rulings are preliminary because they are based on incomplete information about trial strategy and the issues and facts that will be raised at trial. Because the nature of the proposed testimony seems so limited, if the plaintiff prefers to offer Engberg's testimony rather than Bullerdiek's, it might have grounds to do so at a future date.

or entities have concluded. The same goes for Hutter's other design proposals, namely, a timer or improved control knob. The plaintiff claims they "involve logical and straightforward application of engineering principles," but does not explain what Hutter's basis for opining about such principles is. Accordingly, Hutter's opinions about the design of the 5012 will be excluded.

As to Hutter's warnings opinions, however, Coleman provides little basis for their exclusion. Coleman argues (in boldface print) that Hutter did not even draft an alternative warning, and it is true that the *Bourelle* case provides some helpful dicta to Coleman: "The fact that Pacheco never even drafted a proposed warning renders his opinion akin to 'talking off the cuff' and not acceptable methodology." *Bourelle,* 220 F.3d at 539. But here the plaintiff's case is largely based on the fact that the warnings failed to mention the specific danger of carbon monoxide. It does not take a wordsmith to craft a warning that simply references the danger of CO, much as subsequent Coleman product warnings do. Accordingly, it would be simplistic to view Hutter's failure to "draft" an alternative warning as being fatal to his opinion. Moreover, whereas the expert in *Bourelle* was an engineer with no appreciable expertise in warnings, Dr. Hutter has reviewed significant amounts of documentation, including that produced by the CPSC and, given his expertise (a Ph.D. in occupational engineering as well as course work in human factors), can be expected to shed light on the effects warnings have on people. This testimony could assist the jury, and Coleman is fundamentally unpersuasive in seeking to have it excluded.

**4. Marvin Salzenstein**

Coleman also seeks to prevent the plaintiff from using any of the expert opinions given by Marvin Salzenstein. Coleman's basis for exclusion is not based on *Daubert* but on the simple fact that Salzenstein was retained by Drossart in a separate action against Coleman and was not

25

specifically listed as one of Van Den Eng's expert witnesses. The Drossart case has settled, and Salzenstein has apparently indicated that he is not participating in this action. Nevertheless, his testing and opinions were partly relied upon by the plaintiff's experts in this action.

Coleman argues that Salzenstein cannot be used because he was not disclosed as an expert under Rule 26(a)(2)(A), which requires that "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703 or 705 . . ." Fed. R. Civ. P. 26(a)(2)(A). But the plaintiff is not going to "use" Salzenstein at trial to "present evidence," and so it appears Rule 26(a)(2)(A) does not apply. Nor do the cases Coleman cites regarding the unfairness of using undisclosed experts to surprise effect at trial. Indeed, Salzenstein is not appearing as an expert witness–undisclosed or otherwise–but instead his research and opinions are being used by other experts. Nor does it appear that Coleman will be unduly prejudiced by the use of any of Salzenstein's conclusions. He was retained as an expert in the Drossart case, and Coleman has had a chance to depose him. It would be one thing if Van Den Eng intended to use him as a "surprise" expert witness, but in this case Coleman asks me to order the plaintiff's experts to ignore or disregard scientific evidence that might be relevant. Without any persuasive basis for doing so, I will not exclude any use of Salzenstein's opinions.

**5. Declarations of Hutter, Engberg and Bullerdiek**

Coleman also moves to strike the declarations of the plaintiff's three experts, asserting that the plaintiff is improperly attempting to bolster its experts' opinions by way of late-filed declarations. It claims that the experts' reports must contain the entirety of the experts' opinions, *see* Fed. R. Civ. P. 26(a)(2)(B), and any deviation therefrom is prohibited.

26

First, I note that in ruling on the defendant's motion for summary judgment I have not relied upon any of the questioned declarations. Thus, to the extent the motion to exclude is brought in tandem with the motion for summary judgment, the motion is moot. In any event, Coleman has not identified any specific new theories or material statements that would unfairly surprise its experts or that have unfairly prejudiced it. It claims that various parts of the declarations represent new opinions, but its arguments largely appear picayune. If at trial it appears an expert will testify to some wholly novel theory, Coleman can move to exclude at that point. But at this stage, the motion to strike is denied.

## IV. Motion for Default Judgment or Other Sanctions

The plaintiff has moved for sanctions against the defendant for what the plaintiff claims is the defendant's egregious discovery conduct. The plaintiff asserts that the defendant has: (1) produced two unknowledgeable Rule 30(b)(6) witnesses, John Wiley and Stu Meether; (2) intentionally destroyed a testing chamber that was the subject of the plaintiff's inspection request; (3) covered-up the existence of carbon monoxide testing records; (4) unreasonably delayed production of CPSC materials; (5) failed to disclose documents used to refresh the memory of one of its experts, Randy May; (6) failed to produce witnesses to appear at scheduled depositions; and (7) generally obstructed discovery by delay, improper objections, and even physical intimidation.

It is obvious that the three years of this litigation has resulted in some bad blood between counsel and/or the parties, and it is equally clear that the contentiousness has spilled over into the numerous filings, including this motion for sanctions. The plaintiff's brief highlights some instances in which discovery has not proceeded in a fashion designed to produce meaningful

27

information, and even some instances in which tempers flared and disputes became personal.  On the record as it now stands, however, I do not find that sanctions are warranted.

Plaintiff first complains that Coleman has failed to fulfill its obligations under Rule 30(b)(6) to produce knowledgeable witnesses to testify on its behalf concerning the particular matters described by her in deposition notices.  Rule 30(b)(6) authorizes a party seeking discovery from a corporation to name the corporation as the deponent and "describe with reasonable particularity the matters on which examination is requested."  *Id.*  In response, the corporation must designate the person or persons who will testify on its behalf.  The Rule requires that "the persons so designated shall testify as to matters known or reasonably available to the organization."  *Id.*  "Thus, the practical effect of serving a Rule 30(b)(6) notice is to place a duty upon the business entity to designate an individual to testify on behalf of the corporation who has knowledge responsive to subjects requested in the Rule 30(b)(6) requests of its opponents."  *Sanyo Laser Products Inc. v. Arista Records, Inc.*, 214 F.R.D. 496, 502-03 (S. D. Ind. 2003) (internal quotes and citations omitted).  As the Advisory Committee Note states, the Rule is intended to curb the practice of "'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it."  Fed. R. Civ. P. 30 (b)(6) advisory committee note.

Plaintiff claims that its case has been harmed by its inability to receive concrete answers on certain topics, especially regarding Coleman's reaction to CPSC communications and its decision to stop manufacturing Focus heaters.  I conclude, however, that Coleman has met its obligations under Rule 30(b)(6).  It produced witnesses who have testified on the specific matters described in plaintiff's notice.  Plaintiff's Rule 30(b)(6) notice concerning the CPSC correspondence, for

28

example, requested that Coleman designate a person to testify concerning the impact of that correspondence "on Coleman's warnings and design efforts used on the Powermate heater involved in the instant action." (Docket # 173, Ex. 1 at 4.) Coleman designated John Wiley, who essentially testified that the correspondence had no impact on Coleman's warnings and design efforts of the Powermate 5012 propane heater. (Docket # 187, Ex. G. at 25.) With respect to the decision to discontinue the Focus line of heaters, Coleman's designated witness, Stu Meether, testified that it was based on the fact that Coleman's market share was declining and it was not doing well with the product line and the distribution channels it was in. (*Id.*, Ex. J at 58-59.) Not satisfied with the responses to these and other questions, plaintiff requests that the court sanction Coleman by striking its answer and entering judgment against it on the question of liability.

Plaintiff's complaints concerning Wiley center more on his failure to answer questions other than the specific matter she described in her Rule 30(b)(6) notice. Plaintiff complains that Wiley did not investigate what Coleman had done during the development of the Powermate heater. (Br. In Supp. of Mot. for Sanctions at 3.) But what Coleman did in general in developing the Powermate heater was not a matter described in plaintiff's notice. The notice simply asked for a witness to describe the impact the CPSC correspondence had on the warnings and design of the Powermate 5012. Wiley's testimony was to the effect that CPSC investigations of camper heaters had no impact on the development or design of the Powermate line for the simple reason that the Powermate line of propane heater was intended for use in outdoor construction. (Docket # 173, Ex. 2 at 44-46.) What did influence Coleman in its design of the Powermate and whether the CPSC correspondence had any impact on other Coleman products were matters not described by plaintiff

29

in her notice. Coleman cannot be sanctioned because the witness it designated was unable to answer questions about matters not described in the notice.

As to Meether, plaintiff's complaint appears to be that his testimony was not credible. Plaintiff has obtained an internal 1994 memorandum from Coleman describing a plan to redesign its propane heaters and splitting them into the Focus line for camping and the Powermate line for construction use. In light of this plan, plaintiff views the decision to discontinue the Focus line in 1996 with great suspicion and apparently seeks to link it to the carbon monoxide deaths and the CPSC investigation and review of camper heaters. As she notes in her brief, "[i]f Van Den Eng can show that Coleman knew its heaters were unsafe, did nothing to fix them, and simply sold essentially the same heater under a pretext marketing scheme it knew would not match customer usage, the strength of her case at trial improves." (Pl's Br. In Supp. of Mot. for Sanctions at 8.) Plaintiff appears frustrated that Coleman has not produced a witness to say as much. But Rule 30(b)(6) does not entitle a party to the evidence he believes exists. Coleman's designated witness claims the decision to discontinue the Focus line was because of its declining market share. Plaintiff is free to challenge the credibility of the witness at trial, but I find no violation of Rule 30(b)(6) warranting the drastic sanction plaintiff seeks.

I also note that to the extent the criticisms are leveled at Coleman's failure to adequately prepare its witnesses, sanctions or other relief might be proper if at some future date Coleman seeks to present evidence that should have been revealed earlier or that flatly contradicts any statements made by its witnesses. But for the present time it does not appear sanctions are warranted. Especially with regard to Coleman's decision to discontinue the Focus line, the plaintiff raises arguments that could be used at cross-examination to contradict Coleman's stated reasons, but the

30

existence of such evidence does not *ipso facto* mean that Coleman's witness was lying or wholly unprepared to answer.

I reach the same conclusion with respect to the plaintiff's other arguments. The destruction of Coleman's testing chamber appears, at best, only tangentially related to any issue in the case and hardly warrants such a drastic sanction based on the confused set of facts surrounding it. The court will revisit the issue, if requested, at trial, and if Coleman's conduct appears deliberate, the jury can be so advised. Likewise, with respect to Coleman's withholding of documents and interference with discovery. I am unable to determine from the record before me that any of these matters, either in isolation or altogether, warrant striking Coleman's answer and entering judgment in plaintiff's favor. If the misconduct claimed is clearly established at trial, the court will consider an appropriate response at that time. At least for now, however, it would be to both sides' benefit to achieve as rapidly as possible a decision on the merits or settlement rather than dwell on endless discovery disputes such as those set forth in the briefs and in the countless barbs, parries and rejoinders set forth in the parties' footnotes. With the defendant's motion for summary judgment being denied, the case is now finally ready for trial or other definitive resolution, which would only be delayed by proceedings on ancillary matters. Accordingly, the motion for sanctions is denied, but such denial is without prejudice. Given the seriousness of the allegations, the court reserves the right to revisit these matters at a later date.

**V. Motion to Review Sufficiency of Plaintiff's Responses to Requests for Admissions**

Finally, the defendant has also filed a motion asking this court to examine the plaintiff's responses to more than 200 of Coleman's requests for admissions. Although it appears that some of the plaintiff's responses were either vague, unsupported or (in some cases) even nonsensical, the

31

defendant does not explain either how it is truly prejudiced by such responses or why the admissions were required in the first place. To take just one example, Coleman asked the plaintiff to admit that Michael Delfosse and Dean Drossart were "friends," but the plaintiff demurred, noting that the definition of "friend" was vague. Whether the plaintiff's objection was well-founded or merely a cavil, Coleman does not explain why the admission is necessary or why further debate about the nature of human friendship is a useful employment of the parties' or this court's time and resources. In sum, most of the admissions Coleman sought related to fairly mundane issues (which is inherent in the nature of requests to admit), and its complaints about the plaintiff's responses do not justify the kind of intervention it seeks. Indeed, the purpose of Rule 36 is to streamline proceedings, not to create stumbling blocks and needless motion practice. Certainly the rule allows a party to move for a review of the admissions, but it is unclear how most of the admissions Coleman sought would actually have narrowed the pertinent issues for trial. It is also clear that some of Coleman's own requests were unduly burdensome and ill-conceived. For that reason, the motion will be denied.

**VI. Conclusion**

The motions to strike the opinions of Gary Hutter (Docket No. 191) and Robert Engberg (Docket No. 204) are granted in part and denied in part, as set forth herein. The defendant's motion for summary judgment is denied, except as to punitive damages. All other pending motions are denied. The Clerk shall set this matter on for Rule 16 conference for further scheduling. **IT IS SO ORDERED**.

Dated this 9th day of June, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

32